UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Case No. 97-33-JJM |
| v. | |
| PATRICK M. VIGNEAU | |

**GOVERNMENT'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S
MOTION TO REDUCE SENTENCE UNDER 18 U.S.C. § 3582 FOR
EXTRAORDINARY AND COMPELLING REASONS**

The Government files this supplemental memorandum in response to Defendant

Patrick Vigneau's motion to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) based

on concerns about the impact of coronavirus disease 2019 ("COVID-19") as well as

complaints that his drug-trafficking convictions are, he claims, unjust in a time where

marijuana has become more socially acceptable.  Although officials at FCI Danbury, his

Bureau of Prisons (BOP) correctional facility, rejected Defendant's concerns about the

fairness of his conviction, he never submitted his concerns about COVID-19 to BOP

officials at all, and has therefore failed to exhaust that basis for his § 3582(c) claim.  In

any event, neither Defendant's health nor his cannabic concerns represent the sort of

"extraordinary and compelling reason" justifying compassionate release under

§ 3582(c)(1)(A)(1), and his motion should therefore be denied.

## BACKGROUND

### Factual Background

Defendant was convicted of participating in a continuing criminal enterprise

and various drug and money laundering conspiracies based on a lengthy and large-

scale drug distribution scheme, as part of which he and others in the group that he

led imported marijuana from southwestern states and distributed it in the

1

northeast:

> From February 1995 to the end of that year, Vigneau and Richard
> Crandall ("Crandall") coordinated a drug venture whereby Crandall
> shipped marijuana from Texas to Vigneau in Massachusetts and
> Rhode Island.  Vigneau, with the help of others, redistributed the
> drugs to retail dealers in the Northeast.  Vigneau and others
> transmitted some of the proceeds of the drug sales through Western
> Union money orders to Crandall in Texas.  The transfers served the
> dual purpose of allowing Crandall to share in the drug profits, as well
> as fund the purchase of more drugs.  In Texas, the money transfers
> were often received by Timothy Owens ("Owens"), who assisted
> Crandall in acquiring drugs. Owens would cash the checks, and deliver
> the money to Crandall.

> Vigneau and Crandall used a variety of methods to ship the marijuana.
> The drugs were initially shipped through commercial delivery services.
> In March 1995, Vigneau and Crandall purchased two vans so that they
> could transport larger quantities of marijuana themselves.  One of the
> vans was registered in Vigneau's name, the other in Crandall's name.
> In addition, they also began using U-Haul trucks to transport the
> marijuana.  The marijuana was shrink-wrapped in plastic and hidden
> behind furniture, which was then placed in the U-Haul trucks.

> Authorities became aware of the drug smuggling venture.  In
> September 1995, the Drug Enforcement Administration intercepted an
> Airborne Express package with several pounds of marijuana and some
> steroids addressed to a "David Weiber" at 2 Lyon Avenue in East
> Providence, Rhode Island, an address at which Vigneau's wife Donna
> Vigneau ("Donna") was living.  * * *

> . . . During the lengthy trial, the government presented testimony from
> over twenty witnesses . . . .

> On March 2, 1998, a jury found Patrick Vigneau guilty of: engaging in
> a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C.
> § 848 (Count 1); possessing marijuana with the intent to distribute, in
> violation of 21 U.S.C. § 841 (Counts 3 and 4); attempting to possess
> with intent to distribute, in violation of 21 U.S.C. § 846 (Count 5);
> conspiring to distribute marijuana, in violation of 21 U.S.C. §§ 846 &
> 846(a)(1) (Count 6), [and] conspiring to commit money laundering, in
> violation of 18 U.S.C. §§ 1956(h) & 1956(a)(1)(A)(i) (Count 7) . . . .

*United States v. Vigneau*, 337 F.3d 62, 65-66 (1st Cir. 2003); *see also United States*

*v. Vigneau*, 2 F. App'x 53 (1st Cir. 2001); *United States v. Vigneau*, 187 F.3d 70 (1st Cir. 1999); *United States v. Reccko*, 151 F.3d 29 (1st Cir. 1998).  Defendant's offenses involved hundreds of pounds of marijuana as well as the laundering of about $122,000.  *See* ECF No. 321, at 1-2 (Defendant's Supplemental Memorandum); PSR ¶¶ 14, 26.  Defendant, who is now 55 years old, was sentenced to 365 months (about 30 years) of imprisonment, and his projected release date is June 27, 2023.  *See* ECF No. 315-1, at ¶ 1; ECF No. 321, at 2; Docket in No. 97-cr-33-JJM; https://www.bop.gov/inmateloc/ (last visited May 23, 2020).

Having failed to obtain compassionate release from the BOP based on a claim that his conviction is for conduct now deemed socially acceptable and that some of his family members have passed away, *see* ECF No. 318-1, Defendant now moves for relief under Section 603(b) of the 2018 First Step Act, which amends certain aspects of the "compassionate release" provisions of 18 U.S.C. § 3582.  In addition to renewing the arguments he made to the warden of FCI Danbury, Defendant, for the first time, claims that he should be released due to COVID-19 and its likely adverse impact on him given pre-existing medical conditions.  *Compare* ECF No. 321, at 9-10 (Defendant asserts he suffers from health issues that place him at higher risk if he contracts COVID-19) *with* ECF No. 315-1 (Defendant makes no medical claims).  For the reasons discussed below, the Court lacks jurisdiction to consider Defendant's COVID-19 claim and should deny his remaining claims on the merits.

**ARGUMENT**

**A.  Legal Framework**

Under 18 U.S.C. § 3582(c)(1), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment.  Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf.  *Id.* § 3582(c)(1)(A).  A court may grant the defendant's own motion for a reduction in his or her sentence only if the motion was filed "after the defendant … fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If this exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the court finds, as relevant here, both that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  *Id.* § 3582(c)(1)(A)(i).  As the movant, the defendant bears the burden of establishing that he or she is eligible for a sentence reduction.  *See, e.g., United States v. Jaca-Nazario*, 521 F.3d 50, 57 (1st Cir. 2008); *United States v. Ventura-Cruel*, 133 F. Supp. 2d 138, 142 (D.P.R. 2001); *see also United States v. Miamen*, Cr. No. 18-130-1 WES, 18-137-3 WES, 18-142 WES, 2020 WL 1904490, at *2 (D.R.I. Apr. 17, 2020).

4

A reduction in sentence will be consistent with USSG § 1B1.13, the "applicable policy statement" referenced in § 3582(c)(1)(A)(i), if, after considering the § 3553(a) factors, the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community;" and that (iii) the reduction is otherwise consistent with the policy statement.  USSG § 1B1.13 (citing 18 U.S.C. § 3142(g)).[1]

**B.     This Court lacks jurisdiction to modify Defendant's sentence based on his new COVID-19 claim because Defendant has failed to exhaust his administrative remedies with respect to that claim.**

Under 18 U.S.C. § 3582(c)(1), as amended by Section 603(b) of the First Step Act, the Court may not entertain a defendant's request for compassionate release until after either (1) the warden of the BOP facility has denied the defendant's request for compassionate release from his facility and the defendant has fully exhausted his

---

[1] Although the First Step Act afforded inmates a procedural right to seek judicial review of a request for compassionate release, it did not expand the substantive criteria that govern that review.  It necessarily follows that the district court is not authorized to look beyond the factors set forth in Application Notes 1(A)-(C) and corresponding BOP regulations when evaluating whether compassionate release is warranted.  In other words, such policy statements are binding on the Court, and not merely advisory.  *See Dillon v. United States*, 560 U.S. 817, 827 (2010); *United States v. Hogan*, 722 F.3d 55, 60-61 (1st Cir. 2015).

  It is true that the applicable USSC policy statement refers only to motions filed by the BOP Director, rather than by the defendant.  That is because the statement was last amended on November 1, 2018, and, until the enactment of the First Step Act on December 21, 2018, defendants themselves were not entitled to file motions under 18 U.S.C. § 3582(c).  *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. 3582(c) (2012).  In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, USSG § 1B1.13 applies to motions filed by defendants as well.  *See, e.g.*, *United States v. Willingham*, 2019 WL 6733028, at *1-2 (S.D. Ga. Dec. 10, 2019); *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at *2-4 (S.D. Ala. Aug. 13, 2019).

  And while some courts do not consider USSG § 1B1.13 to be binding, they have still concluded that it provides the Court with relevant guidance.  *See, e.g.*, *United States v. Ebbers*, --- F. Supp. 3d ---, 2020 WL 91399, at *4-5 (S.D.N.Y. Jan. 8, 2020); *United States v. Rivernider*, No. 3:10-CR-222(RNC), 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019).  Nothing justifies this Court departing as far afield from the criteria in the USSC's policy statement as defendant urges the Court to do in this case.

administrative remedies, or (2) thirty days has elapsed from the warden's receipt of the defendant's request, whichever is earlier.

In the case at bar, the Court should consider Defendant Vigneau's claims in bifurcated fashion because, although some of them are properly presented, the remainder are not.  The merits of the claims for which Defendant has properly exhausted his remedies are discussed *infra* at pp. 13-16.  As for the COVID-19 claim, Defendant's failure to lodge that claim with FCI Danbury's warden in the first instance is fatal to his current motion for compassionate relief.  *See, e.g., United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020) (*per curiam*) (recognizing the serious concerns presented by COVID-19, but holding that in light of BOP's statutory role and its "extensive and professional efforts to curtail the virus's spread… strict compliance with Section 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance"); *United States v. Johnson*, No. 14-0441, 2020 WL 1663360, at *1 (D. Md. Apr. 3, 2020) (holding that the court lacked jurisdiction to resolve defendant's petition to reduce sentence until he exhausted his administrative remedies or waited 30 days for BOP's response under Section 3582(c)(1)(A)(i)).  Consistent with the First Step Act, the BOP must be given the opportunity to evaluate Defendant's circumstances.

The requirements for filing a sentence reduction motion—including the condition that a defendant exhaust administrative remedies or wait thirty days before moving in court for compassionate release—are properly viewed as jurisdictional.  *See, e.g., United States v. Lugo*, 2:19-cr-00056-JAW, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020) (collecting circuit cases, the majority of which hold the matter is jurisdictional);

*United States v. Ogarro*, No. 18-cr-373-9 (RJS), 2020 WL 1876300, at *2-4 & nn.2-3 (S.D.N.Y. Apr. 14, 2020) (thoroughly reviewing arguments on both sides and collecting relevant cases).  *Accord, e.g.*, *United States v. Reyes-Santiago*, 804 F.3d 453, 458 (1st Cir. 2015) (discussing distinction between time bars imposed by Congress and by judiciary).

But even if the exhaustion requirement of Section 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule that must be enforced if a party "properly raise[s]" it.  *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam) (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a non-jurisdictional but mandatory claim-processing rule); *see also Reyes-Santiago*, 804 F.3d at 458 (Fed. R. App. P. 4(a) is mandatory claim-processing rule for which time limit is mandatory if raised by government).

The government raises the exhaustion rule here, and it must therefore be enforced.  Nothing in the language of the statute allows the Court to overlook the mandatory nature of the exhaustion requirement even in light of the current pandemic. *See, e.g., Lugo*, 2020 WL 1081010, at *3 ("The Government timely raised and objected to [the defendant's] failure to exhaust. . . . The Court must therefore dismiss [the defendant's] motion for failure to comply with the exhaustion provision. . . . [S]ection 3582(c)'s exhaustion requirement 'presents a glaring roadblock foreclosing compassionate release at this point.'") (quoting *Raia*, 954 F.3d at 597); *Miamen*, 2020 WL 1904490, at *3 ("The statutory exhaustion provision in § 3582(c) is plainly mandatory

here," where the government asserts the exhaustion bar).[2]

In Defendant's case, the exhaustion proscription set forth in Section 3582(c)(1)(A) "is clear as day." *Ogarro*, 2020 WL 1876300, at *3. The statute unambiguously permits a motion to the Court only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A). The requirement of a 30-day period to afford BOP the initial review of Defendant's claim that COVID-19 in conjunction with his medical issues justifies compassionate release cannot be excused.

Defendant incorrectly believes that the administrative request FCI Danbury's warden denied in November of 2019, one predicated solely on "changes in state law and the evolving political climate supporting the federal decriminalization of marijuana," ECF No. 318-1, at 1, somehow satisfies the exhaustion requirement for a new claim based on COVID-19. But the "administrative exhaustion of an initial request for compassionate release" does not "discharge that requirement for subsequent requests based on different evidence and argument." *United States v. Jenkins*, No. 4:15-

---

[2] There is no "futility" exception to § 3582(c)(1)(A). Courts have no authority to invent an exception to a statutory exhaustion requirement. *See Miamen*, 2020 WL 1904490, at *3 ("The cases finding implied exceptions to the § 3582(c) exhaustion requirement largely rely on a Second Circuit case addressing a judge-made (rather than a statutorily-imposed) exhaustion requirement. . . . But in contrast to the statutory exhaustion provision before the Court here, 'courts have more latitude in dealing with exhaustion questions when Congress has remained silent[.]'") (citations omitted); *see also United States v. Holden*, No. 3:13-cr-00444-BR, 2020 WL 1673440, at * 5-10 (D. Or. Apr. 6, 2020) (discussing mandatory nature of statutory requirement).

CR-3079, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020).  This Court therefore cannot consider a motion for compassionate release "based on evidence or arguments that weren't presented to the Bureau of Prisons first."  *Id.  See also, e.g., United States v. Valenta*, No. CR 15-161, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020) (refusing to treat defendant's claim for compassionate release based on various medical conditions made on January 7, 2020, as exhausting his administrative remedies for a new claim predicated on COVID-19); *United States v. Mogavero*, Case No.: 2:15-cr-00074-JAD-NJK, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020) (to the same effect); *United States v. Heath*, No: 2:17-CR-0133-TOR, 2020 WL 2114364, at *1-2 (E.D. Wash. May 4, 2020) (same).  *But cf., e.g., United States v. Martinho*, Cr. No. 19-016 WES, ECF. No. 42, at 4-5 (D.R.I. Apr. 24, 2020) (court concluded that petitioner's prior request for compassionate release satisfied the exhaustion requirement and that the court could also consider "the supplemental information provided by both parties regarding Petitioner's current condition in light of the COVID-19 pandemic").

**C.**     **Sound policy reasons buttress the conclusion that BOP should have the opportunity to review the Defendant's circumstances before the Court intervenes.**

By enacting the First Step Act, Congress intended to expand the availability of compassionate release.  But at the same time, Congress expressly imposed on inmates the requirement of initial resort to administrative remedies because BOP extensively assesses such requests.  *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g) (available at

https://www.bop.gov/policy/progstat/5050_050_EN.pdf).  As the Procedures reflect,

BOP conducts a diligent and thorough review, one which applies its considerable

expertise concerning both the inmate and the conditions of confinement.

BOP began planning for potential coronavirus transmissions in January 2020.  At

that time, the agency established a working group to develop policies in consultation

with subject matter experts at the Centers for Disease Control and Prevention ("CDC").

On March 31, 2020, BOP announced that it was implementing Phase Five of its COVID-

19 Action Plan ("Action Plan") in order to minimize the risk of COVID-19 transmission

into and inside its facilities.[3]  The Action Plan includes many preventive and mitigating

measures; for example, all incoming inmates are screened, and staff regularly submit to

enhanced screening; contractor visits are limited to essential services and contractors

are undergoing advanced health screening, while nearly all attorney, social, and

volunteer visits have been suspended; and individual BOP institutions are taking

additional steps to modify operations in order to maximize social distancing, including

securing inmates in their assigned quarters, and staggering meal and recreation times to

the extent possible.

Further, inmate movements between facilities have been extremely limited: all

inmates authorized for movements from all facilities must have been in BOP custody

---

[3] A summary of Phase Five of the BOP's action plan as well as a description of Phases One through Four can be found here:  https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited May 25, 2020).  Phase Five was later extended through Phases Six and Seven, the last in effect through June 30, 2020.  https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp (last visited May 23, 2020).  Additional information about BOP's response, as well as the number of confirmed COVID-19 cases at each facility, can be found here:  https://www.bop.gov/coronavirus/index.jsp (last visited May 23, 2020).

for greater than 14 days and undergo an exit screening for COVID-19 symptoms. COVID-19 guidance is being shared with private prisons and RRCs for dissemination to staff and inmates.  https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 23, 2020). Additionally, BOP "recently began expanding COVID-19 testing of inmates utilizing the Abbott ID NOW instrument for Rapid RNA testing at select facilities experiencing widespread transmission" of the virus.

https://www.bop.gov/resources/news/20200424_expanded_testing.jsp (last visited May 23, 2020).

    In short, serious and substantial measures designed to sharply mitigate the risks of COVID-19 transmission at BOP facilities, including FCI Danbury, have been implemented.  Nevertheless, despite BOP's best efforts, unfortunately some inmates have become ill, and other inmates may become ill in the weeks ahead.  As of May 23, 2020, FCI Danbury reported 12 active cases of COVID-19 among the inmates and 3 active cases among its staff.  There has also been one inmate death.  Seventy-two (72) inmates and 58 staff members have recovered from the disease.  *See* BOP's website at https://www.bop.gov/coronavirus (listing COVID-19 cases at each BOP facility) (last visited on May 25, 2020).  The facility houses roughly 1,025 inmates.[4]

    There are obviously many challenging factors to consider during this

---

[4] Conditions at FCI Danbury are currently the subject of a federal class action lawsuit pending in the District of Connecticut.  The government has disputed the plaintiffs' allegations.  The court has entered a temporary restraining order "aimed at accelerating the process for evaluating inmates for home confinement and compassionate release, and focusing that process on achieving a 'reasonable' balance between the risks to inmate safety and the risks to public safety." *Martinez-Brooks v. Easter*, No. 3:20-cv-569-MPS, ECF No. 30, at 68 (D. Conn. May 12, 2020).

unprecedented pandemic, and BOP should have the opportunity to assess those factors during the statutorily required review period. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider a myriad of other factors, including the availability of transportation for inmates (at a time that interstate transportation services often used by released inmates, such as Greyhound Bus Lines, are providing reduced, if any, service), and of supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

For all of these reasons, BOP is well positioned to determine the proper treatment of the inmate population as a whole as well as Defendant's treatment at FCI Danbury. Even if this Court could overlook the mandatory exhaustion requirement (which the government suggests it cannot), it would be imprudent to prevent BOP from engaging in a review of Defendant's COVID-19 claim. This Court should therefore deny Defendant's motion for compassionate release based on COVID-19 without prejudice to refiling once he has exhausted his administrative remedies on that score.

**D.    Defendant's claims about the changing mores regarding marijuana prosecution do not demonstrate the "extraordinary and compelling reasons" warranting a sentence reduction under Section 3582(c)(1)(A)(i).**

Under Application Note 1 to USSG § 1B1.13, an inmate who is not a danger to the community may qualify for compassionate release in four defined circumstances. None of those four circumstances justifies awarding Defendant the relief he seeks in this case.

First, an inmate may try to show that he has a grave medical condition (such as a terminal illness) that qualifies him for release.  USSG § 1B1.13 app. note 1(A). Defendant never made any claim about his health until he filed his supplemental memorandum – and his medical condition (high blood pressure) is not one that is terminal.  *See* ECF No. 321, at 9-10 & n.4.  Assuming the Court considers that claim on the merits despite Defendant's failure to exhaust his administrative remedies, it is discussed *infra* at pp. 16-20.

The second reason the USSC gives for granting compassionate release applies to an inmate who is age 65 or over and who has served a particular amount of his prison term.  Such an inmate may try to show that he suffers from serious mental or physical deterioration.  USSG § 1B1.13 app. note 1(B).  *See, e.g., United States v. Estrella*, No. 2:15-cr-00032-GZS, 2019 WL 6689897 (D. Me. Dec. 6, 2019) (despite his age, inmate's constellation of medical conditions insufficient to justify release under the "physical deterioration" test).  Defendant is only 55 years old, and his assertion that he suffers from high blood pressure, in any event, has not resulted in "serious mental or physical deterioration."  *See infra* pp. 16-20.

Third, an inmate may try to show exceptional "family circumstances," but these are limited to two discrete situations: (1) "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children; or (2) "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." USSG § 1B1.13 app. note 1(C). Defendant does not allege any such circumstances here.  Based on the affidavit accompanying his original motion, it appears that he does not have a minor child, a spouse, or a registered partner.  *See* ECF No. 315-1, ¶ 3.  Though he notes that many of his family members have died (grandparents, parents, a brother, aunts, uncles, and cousins), *see id.*, personal loss of this sort is not a recognized ground for relief.  *See, e.g.,* *United States v. Greenhut*, Case No. 2:18-CR-00048-CAS, 2019 WL 6218952, at *3 (C.D. Cal. Nov. 21, 2019) ("only 'the death or incapacitation of the caregiver of the defendant's minor child' may constitute an extraordinary or compelling basis to grant a motion for release"); *United States v. Burbidge*, No. 1:15-CR-172, 2019 WL 4863481, at *4 (D.N.D. Oct. 2, 2019) (an expected "consequence of incarceration  is that the parent/child relationship suffers"; this is therefore neither an "extraordinary [n]or compelling" basis for release).  The government further observes that Defendant's *supplemental* memorandum has omitted issues with family members as a separate basis for release.  *See* ECF No. 321, at 7-9.

Fourth, an inmate may qualify for release if the BOP Director determines that there is some other "extraordinary and compelling reason" warranting release.  USSG § 1B1.13 app. note 1(D).  The relevant regulation, which guides this determination, is set

forth in BOP Program Statement 5050.50, available at

https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  This program statement

was amended effective January 17, 2019, following passage of the First Step Act.  It

replaces the previous program statement, 5050.49, CN-1.  Nothing in these provisions or

in any other pertinent legal source suggests that Defendant's allegations concerning

society's view of marijuana prosecutions would supply a basis for a favorable BOP

determination, and the BOP's denial of Defendant's request bears out this conclusion.

*See* ECF No. 318-1 ("Based on the information you provided you do not meet the criteria

outlined in Program Statement 5050.50 under Requests Based on Non-Medical

Circumstances.")

In his supplemental memorandum, Defendant continues to focus on what he

characterizes as a changing legal landscape with respect to marijuana possession, the

perceived harshness of his original sentence, and the sheer length of the time he has

served.  *See* ECF No. 321, at 7-9.  His assertions in this regard do not provide a lawful

basis for compassionate release.

In the first place, as the government has already argued, the Sentencing

Commission's policy statement dictates the scope of this Court's discretion in granting

compassionate release.  This Court's possible disagreement with the policy justifications

underlying the criminalization of drug trafficking as applied to this Defendant are not

among the reasons the Sentencing Commission has endorsed as a basis for

compassionate release.  Even assuming the Sentencing Commission's policy statement

is advisory rather than binding (a conclusion with which the government disagrees),

nothing in that statement buttresses Defendant's claim that society's view, more than two decades after the fact, of a crime or of the sentence imposed justifies granting Defendant's compassionate release motion.  *See United States v. Nasirun*, Case No. 8:99-CR-367-T-27TBM, 2020 WL 686030, at *2 (M.D. Fla. Feb. 11, 2020) ("[W]hile the First Step Act authorizes a court to reduce a term of imprisonment under § 3582(c)(1)(A) on motion of a defendant based on 'extraordinary and compelling reasons,' any reduction must be consistent with the policy statements of the Sentencing Commission.").[5]  At bottom, what Defendant seeks is available as a matter of executive clemency, not through a motion for compassionate relief.  *See United States v. Buenrostro*, 895 F.3d 1160, 1166 (9th Cir. 2018) (discussing executive's power to grant pardons and commute sentences).

E.     **Even assuming it is properly presented, Defendant's claim that COVID-19 supports his release should be rejected on the merits.**

Even assuming Defendant has exhausted the COVID-19 basis for his compassionate release claim, the Court should reject it on the merits because Defendant fails to set forth the extraordinary and compelling reasons required by the statute.  As the government has described, according to the Sentencing Commission's policy statement and its corresponding commentary on [Section] 3582(c)(1)(A), the

---

[5] In any event, Defendant's assertion that the government no longer has an interest in or desire to file marijuana prosecutions, *see* ECF No. 321, at 7-9 & n.3, is simply wrong as a factual matter.  *See, e.g., United States v. Gordon*, 954 F.3d 315 (1st Cir. 2020) (conviction for conspiracy to distribute and possess with intent to distribute marijuana); *United States v. Lobo*, Cr. No. 16-100 WES, 2018 WL 611394 (D.R.I. Jan. 29, 2018) (charges included possession with intent to distribute marijuana); *Collymore v. United States*, 151 F. Supp. 3d 235 (D.RI. 2015) (defendant pled guilty to one count of manufacturing marijuana); *Ives v. United States*, C.A. No. 06-547T, 2009 WL 559936 (D.R.I. Mar. 3, 2009) (defendant pled guilty to three charges of possession of marijuana with intent to distribute).

"extraordinary and compelling reasons" that justify reduction in sentence include "where the defendant is 'suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he is not expected to recover.'" *United States v. Butler*, No. 19-cr-834-10 (PAE), 2020 WL 1689778, at *1 (S.D.N.Y. Apr. 7, 2020) (quoting USSG § 1B1.13(1)(A) & cmt. n.1(a)).  Furthermore, the defendant must not be a danger to the community and the reduction in sentence must be consistent with the Commission's policy statement.  *Id.*  Defendant in this case fails to satisfy these criteria.

### 1. Covid-19, by itself, is not a reason to release Defendant.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction.  As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 954 F.3d at 597; *see also United States v. Eberhart*, Case No. 13-cr-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("[A] reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[6]  Section 3582(c)(1)(A) contemplates sentence reductions

---

[6] *See also, e.g., United States v. Coles*, Case No. 18-cr-20254, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Haney*, No. 19-cr-541 (JSR), 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, No. 18-cr-579 (JSR), 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors).

for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences in order to deal with a world-wide viral pandemic.

This does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating that inmate's risk of becoming seriously ill from COVID-19,[7] that medical condition may satisfy the standard of "extraordinary and compelling reasons" depending on the evidence presented. Similarly, a defendant's age-related decline in health may make him more susceptible to severe illness if he contracts COVID-19 even where his age-related health issues would not otherwise have qualified him for release. *See* USSG § 1B1.13, cmt. n.1(A)(ii)(III).[8]

As part of its analysis of the totality of circumstances, however, courts should consider whether the inmate is more likely to contract COVID-19 if he or she is released

---

[7] *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified May 14, 2020).

[8] The USSC policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is (I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. *Id.* cmt. n.1(A)(ii).

The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. *Id.* cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." *Id.* cmt. n.1(D).

than if he or she remains incarcerated.  That will typically depend on the inmate's

proposed release plan and whether a known outbreak has occurred at his institution.

> **2.      Defendant does not suffer from a serious physical or medical condition that places him at great risk should he become infected by COVID-19.**

Defendant claims to suffer from high blood pressure, but admits that he receives

treatment for that condition.  *See* ECF No. 321, at 9 n.4.  Defendant's most recent

medical records do confirm a history of hypertension that has been well treated

throughout his incarceration.  *See generally* Exhibit A (2020 BEMR) (noting Defendant's

history of medical treatment for hypertension and reporting as recently as February 25,

2020, that Defendant has "[n]o acute cardiopulmonary disease.  Lungs are clear.  Heart

size normal.").  High blood pressure alone is not a condition that CDC considers

advised at "higher risk for severe illness from COVID-19."  *See*

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-

higher-risk.html (last visited May 23, 2020) (listing, *inter alia*, people with chronic lung

disease, diabetes, or with serious heart conditions including *pulmonary* hypertension, as

being particularly at risk of severe illness).  Accordingly, Defendant does not suffer

from a serious medical condition placing him at greater risk of severe illness from

contracting COVID-19.

Defendant claims that, by virtue of the "close quarters" conditions at FCI

Danbury, including common eating and recreational areas, telephones, and baths, he is

"safer at home" than inside prison.  ECF No. 321 at p. 10.  FCI Danbury, however, has

recently informed the government that if released, Defendant would be homeless.  *See*

Exhibit B (Inmate Load Data).  The CDC has explicitly warned that people who are homeless are at risk of COVID-19 and are "a particularly vulnerable group." https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/homelessness.html (last visited May 23, 2020).  Defendant's individual circumstances, therefore, do not warrant a sentencing reduction because they would not place Defendant in a higher risk category for falling severely ill due to contracting the COVID-19 disease.

### 3.    The Section 3553(a) factors do not favor early release for Defendant.

This Court should deny a sentence reduction unless it determines that the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2).  As part of its analysis, the Court should apply the Section 3553(a) factors to the facts at hand.  *See Miamen*, 2020 WL 1904490, at *1-2; *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

As recently as February 27, 2020, BOP determined Defendant to be a "medium recidivism level." See Exhibit C (inmate profile).  It is the government's understanding that BOP is therefore not considering Defendant for home confinement.  As the Section 3553(a) factors likewise support the conclusion that Defendant continues to be a danger to the community, the government does not view Defendant to be a proper candidate for early release.

The nature and circumstances of the numerous offenses in this case establish that Defendant committed serious drug-trafficking and money-laundering crimes that

endangered the community and warranted his sentence of 365 months' imprisonment. After a lengthy trial in which the Government presented over 20 witnesses, Defendant was ultimately convicted of engaging in a Continuing Criminal Enterprise ("CCE"), in addition to conspiring to distribute marijuana, possessing marijuana with the intent to distribute, attempting to possess with intent to distribute, and conspiring to commit money laundering. *Vigneau*, 337 F.3d at 65-67. Based on his role in the money-laundering conspiracy, Defendant was deemed responsible for laundering approximately $122,360 in connection with the drug-trafficking enterprise, which involved the transportation of approximately 700 pounds of marijuana.[9] *See* Exhibit D (updated PSR dated Jan. 10, 2002) at 3, 5-6.

Large-scale drug-trafficking operations undoubtedly endanger the health and safety of the community. *See, e.g., United States v. Mulkern*, 854 F.3d 87, 96 (1st Cir. 2017) ("Drug distribution poses "a greater threat to society" than mere drug use—"though both constitute great dangers . . . .") (citation omitted); *United States v. Ingram*, 415 F. Supp. 3d 1072, 1077-78 (N.D. Fla. 2019) (cataloguing cases discussing the non-physical danger that drug trafficking poses to a community). That the Court repeatedly sentenced Defendant to 365 months' imprisonment even after several remands from the Court of Appeals suggests the conviction with which the Court deemed that sentence appropriate. *See* ECF Nos. 186, 244, 308.

Defendant's criminal history and characteristics also reveal his disrespect for

---

[9] On appeal, the First Circuit vacated Defendant's 21 individual money laundering convictions after concluding that they were predicated on inadmissible hearsay. *Vigneau*, 187 F.3d at 74-78, 82.

authority and penchant for violence and controlled substances.  In his twenties,[10] Defendant began to rack up drug and violent criminal charges in earnest, ranging from assault at ages 24 and 26 to possession of a controlled substance and threatening to kill a woman and her brothers at age 25.  Exhibit D (PSR), at 12–13. Multiple additional charges for assault against Defendant were dismissed after victims failed to appear or wished to no longer cooperate with the prosecution.  *Id*. at 14–15.

Requiring the Defendant to serve his full term of imprisonment not only acknowledges the seriousness of his various offenses but also promotes respect for the law and deters the public from committing similar crimes.  In response to Defendant's previous objection to the adequacy of his criminal history category, the supervising U.S. Probation officer explicitly recommended *against* a downward departure given "the defendant's propensity to be involved in criminal activity on a continuing basis. Additionally, disciplinary reports forwarded from the Donald W. Wyatt Detention Center . . . do[] not demonstrate . . . that Mr. Vigneau has conducted himself in a fashion warranting any type of downward departure from the prescribed guideline range." *See* Exhibit E (Addendum to Presentence Report, dated May 6, 1998) at 2–3.

Defendant's disciplinary record at FCI Danbury is consistent with the sentiments the probation officer expressed at the time of sentencing.  His incarcerative record is rife with sanctions for fighting in 2015 and 2004, boxing/using martial arts in 2003,

---

[10] Defendant's criminal history appears to have begun, however, when he was just 13 years old.  After numerous incidents of breaking and entering people's homes (stealing money and at one point, a motorcycle), the Defendant appears to have been placed at the Trailside Country School in Vermont at the age of 14.  PSR, at 9–11.  He began committing violent and controlled substance offenses in his twenties.

committing opiate-related violations—testing positive for Buprenorphene and possessing Suboxone—in 2015, and exchanging money for contraband in 2012 and 2005. See Exhibit F (Inmate Discipline Data), at 1–4.  Such a disciplinary record does not inspire hope that this Defendant would lead a non-violent, drug-free life if released early.

## CONCLUSION

For the foregoing reasons, Defendant's motion for compassionate release should be denied.

UNITED STATES OF AMERICA

AARON L. WEISMAN
UNITED STATES ATTORNEY

/s/Lauren S. Zurier
LAUREN S. ZURIER
Assistant United States Attorney

/s/Christine D. Lowell
CHRISTINE D. LOWELL
Assistant United States Attorney

s                        United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401) 709-5000 (phone)
(401) 709-5001 (fax)
Lauren.Zurier@usdoj.gov

**<u>CERTIFICATION OF SERVICE</u>**

On May 26, 2020, I caused this filing to be filed electronically and it is available for viewing and downloading from the ECF system, and thereby made the filing available to Defendant's counsel, Assistant Federal Public Defender Kevin Fitzgerald.

/s/ Lauren S. Zurier
LAUREN S. ZURIER
Assistant U.S. Attorney